IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

|  |  |  |
|---|---|---|
| | ) | |
| In re FEDEX CORPORATION | ) | Case No. 08-2284 |
| SHAREHOLDER DERIVATIVE | ) | 08-2369 |
| LITIGATION | ) | |
| | ) | |
| | ) | |
| | ) | |

---

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

---

On May 8, 2008, Plaintiff Plumbers and Pipefitters Local 51 Pension Fund brought an action derivatively on behalf of FedEx Corporation ("FedEx") against the members of FedEx's Board of Directors (the "Board" or "Directors") individually and against FedEx nominally, alleging claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment.  (Case No. 08-2284)  On June 5, 2008, Plaintiff Western Pennsylvania Bricklayers Pension Fund brought an action derivatively on behalf of FedEx against the Directors individually and against FedEx nominally, alleging claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. (Case No. 08-2369)  On August 8, 2008, the Court entered an order consolidating the two actions under the above caption.

On October 6, 2008, the Directors filed a motion to dismiss the consolidated action.  Also on October 6, 2008, FedEx filed a notice of joinder in the Directors' motion to dismiss. Plaintiffs responded on November 5, 2008, and the Directors replied on December 3, 2008.  FedEx filed a notice of joinder in the Directors' reply on December 3, 2008.  With leave of Court, Plaintiffs filed a sur-reply on February 27, 2009, and Defendants filed a joint supplemental brief in support of their motion to dismiss on March 13, 2009.  For the following reasons, Defendants' motion to dismiss is GRANTED.

## I.   Background

FedEx Ground Package System, Inc. ("FedEx Ground") is a wholly-owned subsidiary of FedEx that specializes in small-package shipping and delivery.  (Compl. ¶ 7.)[1]  FedEx Ground was founded in 1985 as "RPS" and renamed "FedEx Ground" in 2000. (Id.)  It employs more than 67,000 people.  (Id.)  FedEx Ground is one of FedEx's most profitable companies and reported revenues of $6 billion in fiscal year 2007.  (Id.)

The Directors have classified FedEx Ground drivers as "independent contractors" rather than as employees.  (Id. ¶ 2.) Plaintiffs allege that this is a misclassification that has caused FedEx Ground to engage in illegal employment and labor

---

[1] Plaintiffs have designated the Western Pennsylvania Bricklayers' Pension Fund complaint (Case No. 08-2369) as the operative complaint in this matter.  (D.E. 49.)

practices in violation of state laws; exposed FedEx to an IRS tax assessment and penalties "amounting to over $300 million for fiscal year 2002 alone"[2]; caused FedEx to incur tens of millions of dollars in legal expenses to defend itself in actions brought to challenge this classification; exposed FedEx to hundreds of millions of dollars in damages in class action lawsuits brought by its "independent contractor" drivers; and caused substantial damage to FedEx's reputation and goodwill.  (Id.)  Plaintiffs allege that this classification was a breach of the Directors' fiduciary duties of loyalty and due care and amounted to gross mismanagement of FedEx Ground, "beginning by at least 2002 and continuing through the date of the filing of this Complaint ('Relevant Time Period')."  (Id. ¶ 1.)

The Board is comprised of fourteen individuals.  (Id. ¶ 9.) Defendant Frederick W. Smith ("Smith") is the founder, Chairman, President, and CEO of FedEx.  (Id.)  Smith was first elected to the Board in 1971 and has served as Chairman of the Board throughout the Relevant Time Period.  (Id.)

Defendant James L. Barksdale ("Barksdale") was elected to the Board in 1999 and has served on the following committees of the Board since 2002: the Compensation Committee from 2004

---

[2] Plaintiffs acknowledge that the IRS has withdrawn its $319 million assessment of tax and penalties for the 2002 calendar year, but maintain that the IRS' audit of FedEx Ground for that year remains open.  (Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss 7 n.7.) ("Pls.' Opp.")

through 2006, the Information Technology Oversight Committee from 2002 through 2007, and the Nominating & Governance Committee from 2007 to the present.  (Id.)  Defendant Barksdale is a former officer of FedEx and served as Executive Vice President and Chief Operating Officer from 1983 to 1992 and Chief Information Officer from 1979 to 1983.  (Id.)  From 2002 through 2006, Barksdale received fees of at least $306,750, exclusive of awards of stock options and shares of common stock, for serving on the Board.  (Id.)  He received $230,688 for serving as a Director in 2007, thus totaling at least $537,438 in compensation during the Relevant Time Period.  (Id.)

Since his election to the Board in 2003, Defendant August A. Busch IV ("Busch") has served on the Board's Compensation Committee.  (Id.)  From 2003 through 2006, Busch received fees of at least $250,000, exclusive of awards of stock options and shares of common stock, for serving on the Board.  (Id.)  Busch received $224,313 for serving as a Director in 2007, thus totaling at least $474,313 in compensation during the Relevant Time Period.  (Id.)

Since his election to the Board in 2003, Defendant John A. Edwardson ("Edwardson") has served on the Audit Committee. (Id.)  From 2003 through 2006, Edwardson received fees of at least $305,100, exclusive of awards of stock options and shares of common stock, for serving on the Board.  (Id.)  Edwardson

4

received $246,625 for serving as a Director in 2007, thus totaling at least $551,725 in compensation during the Relevant Time Period.  (Id.)

Edwardson has received additional financial benefits from his relationship with FedEx.  In July 2005, FedEx Ground entered into a five-year lease for a FedEx Home Delivery facility near Milwaukee, Wisconsin.  (Id.)  FedEx Ground has the option to extend the lease through September 30, 2012.  (Id.)  Under the lease, FedEx Ground's initial gross lease payments are $345,707 per year, and the amount will increase to $361,369 per year after the third year of the lease.  (Id.)  The gross lease payment includes taxes, common area maintenance, and insurance up to a specified dollar amount per square foot.  (Id.) Edwardson has an 11.67% ownership interest in the real estate development company that owns the facility.  (Id.)

FedEx also does business with an entity for which Edwardson serves as an officer.  (Id.)  "In the preceding three fiscal years," FedEx business was responsible for "upwards of one percent (or $1 million, whichever is greater) of the entity's consolidated gross revenues."  (Id.)

Defendant Judith L. Estrin ("Estrin") was elected to the Board in 1989 and has served on the Information Technology Oversight Committee since 2002.  (Id.)  From 2002 through 2006, Estrin received fees of at least $344,000, exclusive of awards

5

of stock options and shares of common stock, for serving on the
Board.  (Id.)  Estrin received $235,875 for serving as a
Director in 2007, thus totaling at least $579,875 in
compensation during the Relevant Time Period.  (Id.)

Defendant Philip Greer ("Greer") was elected to the Board
in 1974.  (Id.)  He served on the Audit Committee from 2002
through 2003 and on the Compensation Committee from 2004 to the
present.  (Id.)  From 2002 through 2006, Greer received at least
$357,200, exclusive of awards of stock options and shares of
common stock, for serving on the Board.  (Id.)  Greer received
$236,750 for serving as a Director in 2007, thus totaling at
least $593,950 in compensation during the Relevant Time Period.
(Id.)

Defendant J.R. Hyde, III ("Hyde") was elected to the Board
in 1977 and served on the Compensation Committee from 2002
through 2003 and on the Information Technology Oversight
Committee from 2004 to the present.  (Id.)  Hyde has an
ownership interest in HOOPS, L.P., the owner of the Memphis
Grizzlies professional basketball team.  (Id.)  "Through one of
his companies," Hyde is also "the general partner of the
minority limited partner of HOOPS."  (Id.)  In 2002, FedEx
entered into a multi-year, $90 million naming rights agreement
with HOOPS.  (Id.)  Under that agreement, FedEx has certain
marketing rights, including the right to name the arena where

6

the Grizzlies play, known as the "FedExForum."  (Id.)  Under an
agreement with HOOPS, the City of Memphis, Tennessee, and Shelby
County, Tennessee, FedEx has agreed to pay $2.5 million a year
for the balance of the twenty-five-year term of the agreement if
HOOPS terminates its lease for the arena after 17 years.  (Id.)

From 2002 through 2006, Hyde received at least $300,400,
exclusive of awards of stock options and shares of common stock,
for serving on the Board.  (Id.)  Hyde received $222,563 for
serving as a Director in 2007, thus totaling at least $522,963
in compensation during the Relevant Time Period.  (Id.)

Defendant Shirley A. Jackson ("Jackson") was elected to the
Board in 1999 and has served on both the Information Technology
Oversight Committee and the Nominating & Governance Committee
from 2002 to the present.  (Id.)  From 2002 through 2006, she
received at least $313,750, exclusive of awards of stock options
and shares of common stock, for serving on the Board.  (Id.)
Jackson received $232,500 for serving on the Board in 2007, thus
totaling at least $546,250 in compensation during the Relevant
Time Period.  (Id.)

Defendant Steven R. Loranger ("Loranger") was elected to
the Company's Board of Directors in 2006 and served on the Audit
Committee from 2006 through 2007.  (Id.)  He was elected to the
Compensation Committee at the end of 2007.  (Id.)  Loranger
received at least $160,750 for serving on the Board in 2007.

(Id.)  FedEx also makes purchases from an entity for which Loranger serves as an officer.  (Id.)  "[T]he amount of the payments made by FedEx to such entity in the preceding three fiscal years has been upwards of one percent (or $1 million, whichever is greater) of the entity's consolidated gross revenues for such year."  (Id.)

Defendant Gary Loveman ("Loveman") was elected to the Board in 2007 and has served on the Board's Audit Committee since his election.  (Id.)

Defendant Charles T. Manatt ("Manatt") was elected to the Board in 2004 and served on the Compensation Committee from 2004 through 2007.  (Id.)  At the end of 2007, he was appointed to the Board's Nominating and Governance Committee.  (Id.)  From 2004 through 2006, Manatt received at least $136,750, exclusive of awards of stock options and shares of common stock, for serving on the Board.  (Id.)  He received $260,750 in total fees for serving as a Director in 2007, thus totaling at least $397,500 in compensation during the Relevant Time Period.  (Id.)

Defendant Joshua I. Smith ("J. Smith") was elected to the Company's Board of Directors in 1989 and has served on the Audit Committee since 2002.  (Id.)  From 2002 through 2006, he received at least $318,200, exclusive of awards of stock options and shares of common stock, for serving on the Board.  (Id.)  J. Smith received $228,625 for serving on the Board in 2007, thus

8

totaling at least $546,825 in compensation during the Relevant Time Period. (Id.)

Defendant Paul S. Walsh ("Walsh") was elected to the Board in 1996 and has served on the Compensation Committee since 2002. (Id.) From 2002 through 2006, he received at least $300,400, exclusive of awards of stock options and shares of common stock, for serving on the Board. (Id.) Walsh received $222,000 for serving as a Director in 2007, thus totaling at least $522,400 in compensation during the Relevant Time Period. (Id.)

Defendant Peter S. Willmott ("Willmott") was elected to the Board in 1974 and has served on both the Audit and Nominating and Governance Committees since 2002. (Id.) He also served in various senior management positions at FedEx Express from 1974 to 1983, including President and Chief Operating Officer. (Id.) From 2002 through 2006, Willmott received at least $367,200, exclusive of awards of stock options and shares of common stock, for serving on the Board. (Id.) He received $249,750 for serving as a Director in 2007, thus totaling at least $616,950 in compensation during the Relevant Time Period. (Id.)

The Board's Nominating and Governance Committee, in consultation with the Audit Committee, is charged with "monitoring the Company's compliance with legal and ethical requirements." (Id. ¶ 15.) The Board's Audit Committee is charged with various financial reporting obligations, internal

9

control oversight, and risk assessment and management obligations. (Id. ¶¶ 19-21.) Plaintiffs allege that the members of the Nominating and Governance and the Audit Committees failed to ensure that FedEx complied with federal and state employment laws and related federal and state tax regulations, thereby breaching their fiduciary duties to FedEx. (Id. ¶¶ 16-18, 23-25.)

As Directors, Defendants owe FedEx "fiduciary obligations of fidelity, trust, loyalty, candor, and due care" and are required to manage FedEx "in a fair, just, honest and equitable manner." (Id. ¶ 26.) The Directors are required to act in furtherance of the best interests of FedEx and its shareholders. (Id.) "Defendants have a duty to manage the Company's exposure to litigation and related expenses and damages in order to prevent losses." (Id.) Plaintiffs allege that the Directors breached their duties by causing FedEx to engage in illegal labor practices.

Defendants' conduct has resulted in fines and assessments from taxation authorities. On December 19, 2007, the Massachusetts Attorney General cited FedEx Ground for "intentionally misclassifying 13 pick-up and delivery drivers as independent contractors rather than employees." (Id. ¶ 46.) The complaint alleges that FedEx Ground was fined and ordered to pay restitution, but does not specify a dollar amount. The

California Employment Development Department determined in a 2004 audit that FedEx Ground "owed more than $7 million in back taxes for misclassifying drivers over a two-year period."  (<u>Id.</u> ¶ 47.)  On December 20, 2007, the IRS assessed FedEx "a $319 million tax assessment inclusive of interest and penalties for fiscal year 2002."[3]  (<u>Id.</u> ¶ 49.)  "Similar issues are under audit by the IRS for calendar years 2004 through 2006."  (<u>Id.</u>) Despite these penalties, "the Board continues to recklessly defend and pursue its course of conduct, stating [in its December 21, 2007 quarterly filing with the Securities and Exchange Commission]: '[W]e continue to believe that FedEx Ground's owner-operators are independent contractors.'"  (<u>Id.</u> ¶ 50.)

Plaintiffs concede that they made no demand on the Board before bringing this derivative action, but argue that demand would have been futile.  Defendants move to dismiss Plaintiffs' derivative action, arguing that the allegations are insufficient to establish demand futility.  Defendants also argue that, even if Plaintiffs could demonstrate demand futility, the complaint fails to state a claim on which relief can be granted.

---

[3] The IRS subsequently withdrew its $319 million tax assessment against FedEx for fiscal year 2002.  (Pls.' Opp. 7 n.7.)

## II.  Jurisdiction and Choice of Law

This Court has jurisdiction under 28 U.S.C. § 1332. Plaintiff Plumbers and Pipefitters Local 51 Pension Fund is a citizen of Rhode Island.  (Case No. 08-2284 Compl. ¶ 5.) Plaintiff Western Pennsylvania Bricklayers Pension Fund is a resident of Pennsylvania.  (Compl. ¶ 5.)  Defendant FedEx is a corporation organized under the laws of Delaware with its principal place of business in Tennessee.  (Id. ¶ 6.)  Defendant Smith is a citizen of Tennessee.  (Id. ¶ 9.)  Defendant Barksdale is a citizen of Colorado.  (Id.)  Defendant Busch is a citizen of Missouri.  (Id.)  Defendant Edwardson is a citizen of Illinois.  (Id.)  Defendant Estrin is a citizen of California. (Id.)  Defendant Greer is a citizen of Connecticut.  (Id.) Defendant Hyde is a citizen of Tennessee.  (Id.)  Defendant Jackson is a citizen of New Jersey.  (Id.)  Defendant Loranger is a citizen of Connecticut.  (Id.)  Defendant Loveman is a citizen of Massachusetts.  (Id.)  Defendant Manatt is a citizen of Washington, D.C.  (Id.)  Defendant J. Smith is a citizen of Maryland.  (Id.)  Defendant Walsh is a citizen of Great Britain. (Id.)  Defendant Willmott is a citizen of Illinois.  The amount in controversy exceeds $75,000.  Because the parties are completely diverse and the amount in controversy exceeds $75,000, the Court has diversity jurisdiction.  28 U.S.C. § 1332.

"Shareholder's derivative actions are governed by Rule 23.1 of the Federal Rules of Civil Procedure, and federal courts apply the law of the state in which the company is incorporated." Brown v. Ferro Corp., 763 F.2d 798, 802-03 (6th Cir. 1985). Because FedEx is a Delaware corporation, Delaware law applies.

## III. Standard of Review

In addressing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts consistent with its allegations that would entitle it to relief. League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007) (citing Kottmyer v. Maas, 436 F.3d 684, 688 (6th Cir. 2006)). This standard requires more than bare assertions of legal conclusions. Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001). A plaintiff must provide the grounds for its entitlement to relief, and this "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). A claim for relief must contain "a short and plain statement of the claims showing that the pleader is entitled to relief."

Erickson v. Pardus, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007).
"Specific facts are not necessary; the statement need only 'give
the defendant fair notice of what the . . . claim is and the
grounds upon which it rests." Id. (citing Twombly, 127 S. Ct.
at 1964.)  To state a valid claim, "a complaint must contain
either direct or inferential allegations respecting all the
material elements to sustain recovery under some viable legal
theory." Bredesen, 500 F.3d at 527 (citing Twombly, 127 S. Ct.
at 1969).

　　　"In a shareholder derivative action, Fed. R. Civ. P. 23.1
requires that the plaintiff 'allege with particularity' the
reasons for failing to make a pre-suit demand." McCall v.
Scott, 239 F.3d 808, 815 (6th Cir. 2001).  "Whether the failure
to make a demand is excused must be determined under the
substantive law of the state of incorporation." Id.  This
heightened pleading requirement, adopted in Delaware Chancery
Rule 23.1, has been described by the Delaware Supreme Court:

> Pleadings in derivative suits are governed by Chancery
> Rule 23.1 . . . [and] must comply with stringent
> requirements of factual particularity that differ
> substantially from the permissive notice pleadings
> governed solely by Chancery Rule 8(a). Rule 23.1 is
> not satisfied by conclusory statements or mere notice
> pleading. On the other hand, the pleader is not
> required to plead evidence. What the pleader must set
> forth are particularized factual statements that are
> essential to the claim.

Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000).

## IV.  Analysis

### Futility of Demand

"A basic premise of corporate governance under Delaware law is that the directors, rather than the shareholders, manage the business and affairs of the corporation." McCall, 239 F.3d at 816 (citing Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984), overruled on other grounds by Brehm, 746 A.2d 244)).  The business judgment rule establishes "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Aronson, 473 A.2d at 812.  "[A] stockholder is not powerless to challenge director action which results in harm to the corporation."  Id. at 811.  However, "[b]y its very nature the derivative action impinges on the managerial freedom of directors."  Id.  "Because derivative suits challenge the propriety of decisions made by directors under their authority, 'stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim.'"  McCall, 239 F.3d at 816 (quoting Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993)).  Thus, shareholders may not bring a derivative suit without first making a demand on the corporation's board of directors. Aronson, 473 A.2d at 811; Del. Ch. Ct. Rule 23.1.

If shareholders fail to make a demand on the board of directors before bringing a derivative action, the shareholders must demonstrate that demand would be futile.  Aronson, 473 A.2d at 814.  A stockholder establishes demand futility if, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  Id.  "These prongs are in the disjunctive.  Therefore, if either prong is satisfied, demand is excused."  Brehm, 746 A.2d at 256.

Pleading demand futility is a "heavy burden."  In re Limited, Inc., No. Civ.A. 17148-NC, 2002 WL 537692, at *3 (Del. Ch. Mar. 27, 2002).  The court must begin with the former inquiry because the protections of the business judgment rule "can only be claimed by disinterested directors."  Aronson, 473 A.2d at 812.  If a majority of the board of directors is found to be "interested," the business judgment rule is inapplicable and "the inquiry ceases.  In that event futility of demand has been established by any objective or subject standard."  Id. at 815.

### A.   Disinterest and Independence of Directors

"[D]irectors are presumed to have discharged their duties faithfully unless and until a plaintiff has made contextually sufficient allegations to raise a reasonable doubt as to their

independence or disinterestedness." Goldman v. Pogo.com, Inc., No. Civ.A. 18532-NC, 2002 WL 1358760, at *2 n.17 (Del. Ch. June 14, 2002). "A director is interested if he will be materially affected, either to his benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders." Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995). "A director is independent if he can base his decision 'on the corporate merits of the subject before the board rather than extraneous considerations or influences.'" Id. (quoting Aronson, 473 A.2d at 816). To establish demand futility, Plaintiffs must raise a reasonable doubt that at least seven of the fourteen Directors are interested or not independent. See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1046 n.8 (Del. 2004) ("[D]emand is excused where a board is evenly divided between interested and disinterested directors." (quoting Beneville v. York, 769 A.2d 80, 85-86 (Del. Ch. 2000))). Plaintiffs argue that a majority of the Directors are interested or lack independence because: (1) the Directors receive excessive financial rewards as FedEx board members; and (2) personal and business entanglements exist between the Directors. (Pls.' Opp. 11-14.)

## 1.   Financial Compensation

Allegations about "the receipt of director's fees, without more, . . . are not enough for purposes of pleading demand

futility."  In re Limited, 2002 WL 537692, at *4; see also
Sutherland v. Sutherland, No. 2399-VCL, 2008 WL 1932374, at *4
(Del. Ch. May 5, 2008) (citing In re Limited, 2002 WL 537692);
Grobow v. Perot, 539 A.2d 180, 188 (Del. 1988) (stating that
allegations that all directors "are paid for their services as
directors . . . without more, do not establish" interest or lack
of independence), overruled on other grounds by Brehm, 746 A.2d
244.

     Plaintiffs cite three cases to support their argument that
the Directors are not independent or disinterested because of
their receipt of director's fees.  All three cases are
distinguishable because the directors in each case are officers
of the corporation, or of a closely related corporation, who
depend on their position with the corporation as their primary
or sole source of income.  See Rales, 634 A.2d at 937; Mizel v.
Connelly, No. Civ.A. 16638, 1999 WL 550369, at *3 (Del. Ch. July
22, 1999); In re Veeco Instruments, Inc. Sec. Litig., 434 F.
Supp. 2d 267, 275 (S.D.N.Y. 2006).

     In Rales, the court found that a reasonable doubt existed
about whether two directors could act independently because of
their financial compensation.  634 A.2d at 937.  One director
was the President and CEO of the corporation who was paid a
salary of approximately $1 million a year by the corporation.
Id.  The second director was the President of a different

corporation in which two fellow directors of the defendant corporation owned a controlling interest.  Id.  The court found a reasonable doubt about the second director's ability to act independently because he was "beholden to the [other directors] in light of his employment."  Id.

In Mizel, the court found a reasonable doubt about whether two directors were disinterested because of the financial compensation they received.  1999 WL 550369, at *3.  One director served as the President and COO of the corporation and the other served as the Vice President and a consultant.  Id. The court reasoned that the directors' positions with the company "constitute [their] principal employment and means of earning a living."  Id.

In In re Veeco, the court held that one director was interested and not independent because the corporation, "as [the director's] principal employer for the past 40 years, is a substantial—if not the sole—source of [the director's] income." 434 F. Supp. 2d at 275.

Plaintiffs have not alleged facts similar to those deemed dispositive in Rales, Mizel, and In re Veeco.  Plaintiffs allege that only one of the Directors, Smith, was a FedEx officer and employee during the Relevant Time Period.  (Compl. ¶ 57.) Although two Directors, Barksdale and Willmott, are former employees of FedEx, neither Director has held an officer

position with the company since 1992.  (Id. ¶ 9.)  Plaintiffs do

not allege that any other Directors receive, or ever have

received, any compensation from FedEx other than their

directors' fees.[4]  Plaintiffs do not allege that any Director

other than Smith depends on his director's compensation from

FedEx as his "principal employment" or "sole source of income."

Under Delaware law, payment of director's fees is insufficient

to establish lack of independence or disinterest for purposes of

demand futility.  Plaintiffs have not established a reasonable

doubt about the Directors' disinterest or independence based on

the Directors' compensation for their services.

### 2.    Personal and Business Relationships

Personal and business relationships among directors and

between a director and the corporation "may influence the demand

inquiry."  Beam, 845 A.2d at 1050; see also In re J.P. Morgan

Chase & Co. Shareholder Litig., 906 A.2d 808, 821-22 (Del. Ch.

2005).  "[A] director may be compromised if he is beholden to an

interested person" because of "'personal or other relationships'

to the interested party."  In re Oracle Corp. Derivative Litig.,

---

[4] Plaintiffs allege that three Directors, Loranger, Edwardson, and
Hyde, work for or have an ownership interest in companies with which
FedEx transacts business.  (Compl. ¶ 9.)  Plaintiffs do not allege
that these relationships relate to FedEx Ground's independent
contractor model or that those three Directors depend on benefits
obtained through those transactions as their principal employment or
means of earning a living.  Moreover, even assuming arguendo that
Loranger, Edwardson, and Hyde are interested because of their business
transactions with FedEx, the majority of the Directors would remain
independent and disinterested.

824 A.2d 917, 938-39 (Del. Ch. 2003) (citations omitted).  "To establish lack of independence, [a plaintiff] must show that the directors are 'beholden' to the [interested directors] or so under their influence that their discretion would be sterilized."  Rales, 634 A.2d at 936.  "[T]o render a director unable to consider demand, a relationship must be of a bias-producing nature.  Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."  Beam, 845 A.2d at 1050.

Plaintiffs assert that the following "personal and business entanglements" are sufficient to raise a reasonable doubt about the Directors' independence:

- Directors Estrin, Smith, and Barksdale have served and continue to serve on the Board of Trustees of the Mayo Clinic concurrently. [Compl.] ¶ 57(h)(i).
- Directors Estrin and Barksdale served concurrently on the board of directors of Sun Microsystems, Inc. from 1999 to 2003. Id. at ¶ 57(h)(ii).
- Defendant Estrin started a business called Packet Design with $24 million in funding from, among others, defendant Barksdale. Id. at ¶ 57(h)(xi).
- The close relationship between Directors Estrin and Barksdale helped in forming an alliance between AOL Time Warner Inc. (where Barksdale was a director) and Disney (where Estrin was a director). Id. at ¶ 57(h)(iii).
- Directors Smith and Hyde were members of an investment group that entered into a joint venture with Memphis Light Gas and Water to bring broadband fiber optic network to the Memphis area. Id. at ¶ 57(h)(xiii).
- Directors Greer and Smith have been friends for 35 years. Id. at ¶ 57(h)(iv).

▪ Directors Smith, Barksdale, Hyde and Willmott are members of the Society of Entrepreneurs. Id. at ¶ 57(h)(v).
▪ Directors Smith and Hyde were classmates at Memphis University School, a small (current grade 7-12 enrollment is 660) college preparatory school for boys. They also currently serve on the school's Board of Trustees. Id. at ¶ 57(h)(vi).
▪ Directors Smith and Loveman were members of the Yale School of Management Leaders Forum in 2006-2007. Id. at ¶ 57(h)(vii).
▪ Directors Greer and Willmott were classmates at Harvard Business School. Id. at ¶ 57(h)(viii)

(Pls.' Opp. 14-15.) Plaintiffs argue that, because of these relationships, "the Directors are 'beholden to' each other, thus 'sterilizing' their discretion." (Id.)

Plaintiffs cite two cases, Parfi Holding AB v. Mirror Image Internet, Inc. and In re New Valley Corp. Derivative Litig., for the proposition that "'current or past business, personal, and employment relationships with each other and the entities' are sufficient to raise a reasonable doubt regarding independence." In re New Valley, No. Civ.A. 17649, 2001 Del. Ch. LEXIS 13, at *25 (Del. Ch. Jan. 11, 2001); Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211 (Del. Ch. 2001), rev'd 817 A.2d 149 (Del. 2002). Both cases are distinguishable from the case at bar because the directors' relationships in those cases related to the underlying transaction. In Parfi, the plaintiffs challenged a series of transactions between the defendant corporation and its majority corporate shareholder. 794 A.2d at 1214-15. The court found a reasonable doubt about a director's

independence because he served on the board of directors of both corporations that were parties to the transactions.  Id. at 1230-31.  In In re New Valley, the plaintiffs challenged the directors' approval of a $55 million purchase of stock from its controlling shareholder.  Id. at *1-3.  Of the eight New Valley directors, two were major shareholders in the seller, another was "employed by and received substantial compensation from" the seller, and two others had received $30,000 each from the seller for agreeing to be director nominees in an unrelated proxy bid. Id. at *7.  In the case at bar, Plaintiffs have not alleged that the Directors' "entanglements" relate to the challenged decision.  Unlike the plaintiffs in Parfi and In re New Valley, Plaintiffs have not alleged relationships among the Directors that relate to the underlying decision to maintain the independent contractor model for FedEx Ground drivers.

Under Delaware law, the business and personal relationships that Plaintiffs allege are insufficient to create a reasonable doubt about the Directors' independence.  In In re J.P. Morgan Chase, the court held that the plaintiffs failed to carry their burden of establishing a reasonable doubt, noting that "the board is dominated by outsiders" because "eleven of the twelve directors are not employees" of the defendant corporation.  906 A.2d at 821.  Although the plaintiffs alleged that the defendant directors were beholden to the inside director, the plaintiffs

"fail[ed] to demonstrate why that [was] so."  Id.  Because the
plaintiffs did not allege that the one inside director was a
controlling stockholder of the corporation, the outside
directors were not beholden to the inside director for their
positions.  Id.  The court reasoned that the plaintiffs
"fail[ed] to allege . . . facts showing a connection between the
[underlying decision] and [the] defendant directors."  Id. at
822.

The allegations in the case at bar are largely analogous to
those in In re J.P. Morgan Chase.  Plaintiffs allege that only
one of the fourteen Directors, Smith, is an inside director.
Plaintiffs do not allege that Smith is the controlling
shareholder of FedEx such that a board "dominated by outsiders"
is beholden to him.  Plaintiffs' allegations focus on various
Directors' being friends, classmates, members of the same
organizations, and, in some cases, outside business partners.
Delaware courts have deemed such allegations, standing alone, to
be insufficient to create a reasonable doubt about directors'
independence.  See id. (directors' business, friendship,
familial, and charitable relationships to the defendant
corporation, the CEO, and corporations with which the defendant
corporation conducted business were insufficient to create a
reasonable doubt of independence); Beam, 845 A.2d at 1051
("Allegations that [defendant director] Stewart and the other

24

directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence."); Cal. Pub. Employees Ret. Sys. v. Coulter, No. Civ.A. 19191, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) ("Our cases have determined that personal friendships, without more; outside business relationships, without more; and approving of or acquiescing in the challenged transactions, without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment."); Jacobs v. Yang, No. Civ.A. 206-N, 2004 WL 1728521, at *7 (Del. Ch. Aug. 2, 2004) ("[I]t is well settled that social and business ties alone do not give rise to a lack of independence.").

Plaintiffs also fail to allege how the Directors' personal and business relationships would impinge on their ability to act independently in making the underlying decision about classifying FedEx Ground drivers.  Plaintiffs cannot rely on a "mere inference" that the Directors' personal or business relationships, without more, will prevent them from acting independently.  See In re J.P. Morgan Chase, 906 A.2d at 822. Plaintiffs make no allegations that establish that any of the Directors are "beholden" to Smith or to their fellow Directors

or are "so under their influence that their discretion would be sterilized." Rales, 634 A.2d at 936.  Plaintiffs have failed to establish that the personal and business relationships among the Directors create a reasonable doubt about the Directors' independence.

### B.    Exercise of Directors' Business Judgment

The business judgment rule establishes a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.  Absent an abuse of discretion, that judgment will be respected by the courts." Aronson, 473 A.2d at 812.  The party challenging the board's decision bears the burden of rebutting the presumption created by the business judgment rule.  Id.

"To establish demand futility under Aronson's second prong, a complaint must raise a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.  This is a high standard to satisfy." Postorivo v. AG Paintball Holdings, Inc., Nos. 2991-VCP, 3111-VCP, 2008 WL 553205, at *8 (Del. Ch. Feb. 29, 2008).  "A plaintiff who seeks to excuse demand through the second prong of Aronson thus faces a task closely akin to proving that the underlying transaction could not have been a good faith exercise of business judgment."

In re INFOUSA, Inc. Shareholders Litig., 953 A.2d 963, 972 (Del. Ch. 2007).

To rebut the presumption of good faith for purposes of demand futility, the "plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." In re J.P. Morgan Chase, 906 A.2d at 824 (quoting In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del. Ch. 2003)). "If the business judgment rule is not rebutted, a 'court will not substitute its judgment for that of the board if the [board's] decision can be attributed to any rational business purpose.'" Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d 1361, 1373 (Del. 1995) (quoting Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954 (Del. 1985)).

Plaintiffs do not argue that the Directors were not adequately informed in making their decision to classify FedEx Ground drivers as independent contractors. Plaintiffs argue that the Directors were well aware of the adverse legal authority relating to their decision, but nevertheless continued using the independent contractor model. (Pls.' Opp. 5-6.) Plaintiffs recognize that the Directors "reviewed FedEx Ground's independent contractor model" and "closely monitor legal proceedings concerning" that model. (Pls.' Opp. 6; Compl. ¶

52.)  Thus, the Court limits its analysis to whether Plaintiffs have pled particularized facts sufficient to raise a reason to doubt that the Directors' action was taken honestly and in good faith.  See In re J.P. Morgan Chase, 906 A.2d at 824.

Defendants argue that the complaint "contains nothing more than conclusory allegations that the directors" breached their duty of due care and "is devoid of substantive allegations that any of the Individual Defendants did not act honestly or in good faith."  (Defs.' Mem. in Supp. of Mot. to Dismiss 17-18.) ("Defs.' Mem.")  Plaintiffs reply that "the Directors did not act in good faith and breached their duty of care by directing, monitoring and supervising the deliberate illegal misclassification of the 14,000+ FedEx Ground drivers as 'independent contractors.'"  (Pls.' Opp. 5.)  Plaintiffs argue that, under Delaware law, "bad faith conduct" includes acting "with the intent to violate applicable positive law," and that the complaint alleges that "the Directors knew or should have known that violations of law were occurring and took no steps to prevent or remedy the situation."  (Id. 6.)

The parties sharply dispute whether FedEx's independent contractor model for FedEx Ground is illegal.  That issue has been the subject of extensive litigation, both in civil courts and in administrative proceedings.  Although Plaintiffs aver that the Directors' decision to continue operating under that

28

model contradicts "overwhelming legal authority" that the
independent contractor classification is illegal, the relevant
authority does not appear to be as clear and one-sided as
Plaintiffs represent.  See, e.g., Mailhot v. FedEx Ground
Package System, Inc., No. 02-257-JD (D.N.H. Feb. 13, 2004)
(FedEx Ground driver was not an employee for purposes of
Americans with Disabilities Act claim); Estrada v. FedEx Ground
Package Sys., Inc., 64 Cal. Rptr. 3d 327 (2d Dist. 2007)
(affirming trial court's decision drawing a distinction between
drivers who operated a single work area or route and those who
operated multiple work areas or routes for purposes of
certifying a class of FedEx Ground drivers in case challenging
independent contractor model); FedEx Ground Package Sys., Inc.
d/b/a FedEx Home Delivery and FXG-HD Drivers Assoc., Case No.
04-RC-20974 (Sept. 21, 2005) (Regional Director's Supplemental
Decision) (National Labor Relations Board finding that
contractors who operate multiple routes on FedEx's Ground's
behalf were not employees for purposes of National Labor
Relations Act); but see Tumulty v. FedEx Ground Package Sys.,
Inc., No. C04-1425 MJP, 2005 U.S. Dist. LEXIS 26215, at *19
(W.D. Wash. Mar. 4, 2005) (holding that FedEx was a joint
employer of a FedEx Ground driver for purposes of Fair Labor
Standards Act and Washington Minimum Wage Act claims); Estrada,
64 Cal. Rptr. 3d at 335 (holding that drivers were FedEx Ground

employees for purposes of determining their right to reimbursement for work-related expenses).

Plaintiff's argument that the Directors acted in bad faith, so that the good faith presumption of the business judgment rule is rebutted, is based on the notion that the Directors were aware, or should have been aware, that the independent contractor model was a misclassification of FedEx employees that exposed the company to potential legal liability.  To support that theory of breach of duty of care, Plaintiffs cite In re Caremark Derivative Litig., 698 A.2d 959 (Del. Ch. 1996).  In that case, the plaintiffs' "claim [was] that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance."  698 A.2d at 967.  In approving the proposed settlement in In re Caremark, the court stated that the directors appeared to be protected by the business judgment rule, noting that the plaintiffs' theory "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  Id.  The court emphasized "the good policy reasons it is so difficult to charge directors with responsibility for corporate losses for an alleged breach of care, where there is no conflict of interest or no facts suggesting suspect motivation involved."  Id.

Plaintiffs have not alleged particularized facts sufficient to rebut the presumption of good faith afforded to the Directors under the business judgment rule.  Although Plaintiffs allege that the Directors "breached their fiduciary obligations" to FedEx, the Court is not required to accept such conclusory allegations as true.  See Grobow, 539 A.2d at 188 n.6 ("Even under the less stringent standard of a [Rule 12(b)(6)] motion to dismiss, all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true, but neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true"); Ash v. McCall, No. Civ.A. 17132, 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000) ("[T]his Court has stated on several occasions that mere allegations that directors made a poor decision—absent some showing of self-dealing or suspect motivation—does not state a cause of action, much less meet the standard for excusing demand under the second prong of Aronson.").

The factual allegations Plaintiffs make to support the Directors' alleged breach of their fiduciary duties are that the Directors "knowingly acquiesced in the wrongful conduct" and "failed to ensure that the Company compl[ied] with federal and state tax regulatory entities." (Compl. ¶¶ 24-25.)  Plaintiffs' assertion that FedEx's independent contactor model is "illegal"

is a legal conclusion that the Court is not required to accept as true.  See Grobow, 539 A.2d at 187 ("[U]pon a motion to dismiss, only well-pleaded allegations of fact must be accepted as true; conclusionary allegations of fact or law not supported by allegations of specific fact may not be taken as true.  A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.").  As discussed supra, legal authority on the independent contractor issue is divided.  The Directors' decision to maintain and defend FedEx's independent contactor model, in response to both favorable and adverse rulings on the issue, does not equate to "act[ing] with the intent to violate applicable positive law."  See Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 369 (Del. 2006). (stating that under "the Caremark standard for so-called 'oversight' liability," establishing "a failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e. gross negligence)"); In re Caremark, 698 A.2d at 971 (noting that a company's practices, while "contestable," may still be "lawful").

In In re Caremark, the court noted that director liability for corporate losses, or exposure to such losses, is rare "where there is no conflict of interest or no facts suggesting suspect

motivation involved." 698 A.2d at 967. Like the plaintiffs in
In re Caremark, Plaintiffs have not alleged particularized facts
that could establish a conflict of interest, self-dealing, or
suspect motivation among the Directors with respect to their
decision to classify FedEx Ground drivers as independent
contactors. None of Plaintiffs' allegations suggests that the
Directors receive any benefit from the independent contactor
model that the corporation and its shareholders do not also
enjoy. In fact, it is not clear from the complaint that the
decision to employ the independent contractor model has caused
losses for FedEx. Plaintiffs allege that "FedEx Ground's
misclassification of its drivers as independent contractors has
enabled FedEx Corp. to evade significant payroll costs amounting
to hundreds of millions, if not billions, of dollars." (Compl.
¶ 36.) Plaintiffs do not allege that the Directors have
misappropriated these savings. As FedEx shareholders,
Plaintiffs benefit from these savings.

As described by the court in In re Caremark, Plaintiffs'
theory that the Directors' lack of oversight exposed FedEx to
potential legal liability "is possibly the most difficult theory
in corporation law upon which a plaintiff might hope to win a
judgment." 698 A.2d at 967. Other Delaware courts have
explained that the difficulty in this theory of liability lies
in the scienter requirement of oversight liability:

33

> Caremark . . . plainly held that director liability for failure to monitor required a finding that the directors acted with the state of mind traditionally used to define the mindset of a disloyal director—bad faith—because their indolence was so persistent that it could not be ascribed to anything other than a knowing decision not to even try to make sure the corporation's officers had developed and were implementing a prudent approach to ensuring law compliance. By reinforcing that a scienter-based standard applies to claims in the delicate monitoring context, Stone ensured that the protections that exculpatory charter provisions afford to independent directors against damage claims would not be eroded.

Desimone v. Barrows, 924 A.2d 908, 935 (Del. Ch. 2007) (citing Stone, 911 A.2d 362).

Plaintiffs' allegations cannot support the finding of bad faith required for oversight liability under Delaware law. Plaintiffs' complaint acknowledges that the "Board of Directors has reviewed FedEx Ground's independent contractor model and closely monitors the status of" any proceedings challenging that model. (Compl. ¶¶ 28, 52.) Plaintiffs' allegations do not equate to a "knowing decision not to even try to make sure the corporation's officers had developed and were implementing a prudent approach to ensuring law compliance." See Desimone, 924 A.2d at 935; see also In re Caremark, 698 A.2d at 967 ("[O]nly a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition

to liability.").  Plaintiffs have failed to plead particularized
facts that could satisfy the bad faith requirement for Caremark
oversight liability such that the Directors' decision was not
within the protection of the business judgment rule.

Plaintiffs' burden to rebut the business judgment rule's
presumption of good faith is "a high standard to satisfy."
Postorivo, 2008 WL 553205, at *8.  Where, as here, the
transaction or decision is approved "by a majority of
independent, disinterested directors," the presumption of good
faith is heightened.  Grobow, 539 A.2d at 190.  Plaintiffs have
failed to rebut that heightened presumption by pleading
particularized facts sufficient to raise a reason to doubt that
the Directors' action was taken honestly and in good faith.  See
In re J.P. Morgan Chase, 906 A.2d at 824.  Plaintiffs have
failed to plead demand futility under the second Aronson prong.

### C.   Totality of the Circumstances

Plaintiffs argue that the Directors' independence and
disinterestedness cannot be viewed in isolation but "must also
be reviewed in totality with all of Plaintiffs' other demand
futility allegations."  (Pls.' Opp. 16.); see McCall, 239 F.3d
at 816-17 ("[W]hether plaintiffs have alleged facts sufficient
to create a reasonable doubt concerning the disinterestedness
and independence of a majority of the Board must be determined
from the accumulation of all the facts taken together.") (citing

Harris v. Carter, 582 A.2d 222, 229 (Del. Ch. 1990)).
Plaintiffs argue that their allegations, when viewed in
totality, "are sufficient for the Court to conclude that there
is a reasonable doubt that a majority of the Board could not
have impartially considered a demand to commence this action."
(Pls.' Opp. 16.)

Plaintiffs' allegations fail to create the reasonable doubt
to which Aronson refers, even when considered in totality.
Plaintiffs' allegations of interest through Director
compensation relate only to director's fees.  The allegations of
personal and business relationships are primarily of
friendships, outside business ventures, and service in the same
organizations, and they are not alleged to relate to the
underlying, challenged business decision.  Plaintiffs allege
that the Directors have breached their fiduciary duties to
FedEx, but the complaint contains no particularized allegations
of bad faith or dishonesty other than the Directors' failure to
abandon the allegedly "illegal" independent contractor model.
Even taken together, these allegations are insufficient to
create a reasonable doubt about whether a majority of the
Directors could consider independently and disinterestedly a
demand for relief by FedEx shareholders.  See also In re Pfizer
Inc. Derivative Sec. Litig., 503 F. Supp. 2d 680, 686 (S.D.N.Y.
2007) (applying Delaware law) ("The Court must examine the

totality of the circumstances, but I do not see how aggregating a number of factors, none of which excuses demand, can somehow excuse demand.").

Plaintiffs have failed to establish demand futility under either prong of the Aronson test.  Because they failed to make pre-suit demand on the Board of Directors before bringing this derivative claim, Plaintiffs' action must be dismissed.[5]

**V.   Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

So ordered this 30th day of July, 2009.


s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

---

[5] Because Plaintiffs have not pled sufficient facts to establish demand futility, the Court need not address Defendants' argument that Plaintiffs' complaint fails to state a claim on which relief can be granted.